IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION

**HEART TO HEART HOSPICE, INC.**                                                                **PLAINTIFF**

V.                                                                                   Civil Action No. 1:07-CV-289-M-D

**MICHAEL O. LEAVITT, Secretary of**
**the United States Department of Health**
**and Human Services,**                                                                **DEFENDANT**

## ORDER

This cause comes before the court on the separate motions of plaintiff Heart to Heart Hospice and defendant Michael O. Leavitt, Secretary of the U.S. Department of Health and Human Services, each seeking summary judgment in the above-entitled action. For the reasons explained *infra*, the court concludes that the facts of this case and also the broader legal and public policy issues raised herein require further development prior to a ruling by this court. The court will therefore remand this case for further proceedings, and the parties' motions for summary judgment will each be denied.

This is an important case in which plaintiff, a Mississippi hospice provider, seeks for this court to invalidate a regulation propounded by the Department of Health and Human Services relating to the calculation of Medicare benefits provided for hospice care. On April 9, 2007, Medicare's fiscal intermediary made a demand to plaintiff for repayment of Medicare hospice care benefits in the amount of $1,592,213 for the period from November 1, 2004 through October 31, 2005. On April 17, 2007, plaintiff timely filed an appeal of this determination with the Provider Reimbursement Review Board ("PRRB"), as permitted by the Medicare statute.

On September 14, 2007, plaintiff received a letter from the PRRB granting expedited judicial review on the basis that the appeal involved principally a legal challenge to the validity of the regulation which the PRRB is without the authority to decide. On November 13, 2007, plaintiff filed the instant action in this court, challenging the validity of the regulation at issue in this case. The parties have filed separate motions for summary judgment, asserting that no genuine issue of material fact exists and that they are entitled to judgment as a matter of law.

Prior to addressing the parties' arguments, a review of the history of the Medicare hospice benefits is in order. In 1982, Congress amended the Medicare statute to provide coverage for hospice care. To be eligible for hospice benefits, an individual must be "terminally ill," which is statutorily defined as "a medical prognosis that the individual's life expectancy is 6 months or less." 42 U.S.C. § 1395x(dd)(3)(A). By electing to receive hospice benefits, a patient waives all rights to Medicare payments for treatment of the underlying terminal illness and related conditions by someone other than the individual's attending physician or the chosen hospice provider. 42 U.S.C. § 1395d(d)(2)(A). A Medicare beneficiary may elect the hospice benefit for specific lengths of time referred to as benefit periods. The first two such periods last ninety days; benefit periods thereafter last sixty days. 42 U.S.C. § 1395d(d)(1). A beneficiary may elect hospice care for an unlimited number of benefit periods, provided each election is accompanied by the requisite certification of terminal illness. *Id.* However, the total payment to a hospice in an accounting year (running from November 1 to October 31) is limited by a statutory cap, *see* 42 U.S.C. § 1395f(i)(2)(A), and payments made in excess of the statutory cap must be refunded by the hospice care provider.

As noted by the government in its brief, legislative history explains that "the intent of the

cap was to ensure that payments for hospice care would not exceed what would have been expended by Medicare if the patient had been treated in a conventional setting." H.R. Rep. No. 98-333 (98th Cong. 1st Sess.) at 1.  The statutory cap is calculated for each hospice care provider by multiplying the applicable "cap amount" by the "number of medicare beneficiaries in the hospice program in that year." 42 U.S.C. § 1395f(i)(2)(A).  While it is undisputed that the inflation-adjusted "cap amount" for the accounting year ending October 31, 2005 was $19,777.51, the proper means for calculating the "number of beneficiaries" is at the heart of the present lawsuit.  The relevant Medicare statute provides that:

> the number of medicare beneficiaries in a hospice program in an accounting year is equal to the number of individuals who have made an election under subsection (d) of this section with respect to the hospice program and have been provided hospice care by (or under arrangements made by) the hospice program under this part in the accounting year, such number reduced to reflect the proportion of hospice care that each such individual was provided in a previous or subsequent accounting year or under a plan of care established by another hospice program.

42 U.S.C. § 1395f(i)(2)(C).  Unfortunately, the Medicare statutes provide no guidance regarding how the number of beneficiaries should be "reduced to reflect the proportion of hospice care that each such individual was provided in a previous or subsequent accounting year," instead directing the Secretary of the Department of Health and Human Services to promulgate regulations in this regard.

HHS's regulatory response to this statutory directive, first promulgated in 1983, is set forth in 42 C.F.R. § 418.309.  This regulation provides in pertinent part as follows:

> The hospice cap amount is calculated using the following procedures:
>
> (b) Each hospice's cap amount is calculated by the intermediary by multiplying the adjusted cap amount determined in paragraph (a) of this section by the number of Medicare beneficiaries who elected to receive hospice care from that hospice

> during the cap period. For purposes of this calculation, the number of Medicare beneficiaries includes—
>
> (1) Those Medicare beneficiaries who have not previously been included in the calculation of any hospice cap and who have filed an election to receive hospice care, in accordance with §418.24, from the hospice during the period beginning on September 28 (35 days before the beginning of the cap period) and ending on September 27 (35 days before the end of the cap period).

The regulation thus establishes a rather simple method for determining the number of beneficiaries in a particular year by using September 28 as the cutoff date for a particular fiscal year. Under this method, a patient who first sought hospice care on September 27, 2005 would be counted in the 2005 fiscal year for determining the "number of beneficiaries" in that year, while a patient who first sought hospice care on September 30, 2005 would be counted in the 2006 fiscal year. This simplified method is in contrast to the proportional allocation method which the same regulation uses to determine the number of beneficiaries in cases where care is sought in multiple hospices. See 42 C.F.R. § 418.309(b)(2).

This lawsuit, and similar lawsuits filed in other federal courts, is based largely upon the premise that HHS acted arbitrarily and capriciously by choosing the path of least administrative resistance in calculating the number of beneficiaries. Plaintiff argues that, by establishing September 28 as an arbitrary cut-off date, HHS lessened its own administrative burden at the cost of burdening hospice providers with onerous demands for refunds. Specifically, plaintiff argues in its brief that:

> The allocation of the cap payment only to the first reporting period in which the beneficiary elects the hospice benefit results in the assignment of the entire cap payment amount to the first reporting period, even if most of the care for that patient is rendered during a subsequent period. Unused cap amounts are thus trapped in the prior fiscal year, regardless of whether the beneficiary continues to receive care in subsequent years. Hospices such as Heart to Heart thus lose the full benefit of a cap amount that has already become inadequate for the expanded

hospice coverage provided by the statute since 1998.

While the policy issues in this context are not sufficiently clear for this court to so state definitively, it appears that plaintiff may well have raised valid concerns in this case. Indeed, the court would note that in a motion hearing held almost a year ago, an Oklahoma District Judge found persuasive the arguments of a hospice provider similarly situated to the plaintiff here. In *Sojourn Care, Inc. v. Leavitt*, No. 07-375 (N.D. Okl. 2007), U.S. District Judge Gregory K. Frizzell made the following observation in granting the plaintiff's motion for summary judgment:

> I don't believe that the statutory language which requires that the number of Medicare beneficiaries is to be reduced is in any way reflected in an allocation to one of the fiscal years, one or the other, and it's certainly not - it doesn't honor the statutory language that the number must be reduced to reflect the proportion of hospice care that each such individual was provided. ... The number of Medicare beneficiaries is simply not reduced under this regulation in any way to reflect the proportion of hospice care that each such individual was provided in a previous or subsequent accounting year[.] ... Obviously it was adopted for administrative convenience which I have recognized on this record is a common practice. I simply don't believe that it follows the statutory mandate in the statute.

[*Soujourn Care*, summary judgment hearing transcript at 55].

After having reviewed the relevant statutory language and the Secretary's arguments in this case, this court tends to agree with Judge Frizzell's observations stated above. In defending its regulation in this case, the Secretary argues that its "rationale for this rule is straightforward: it achieve[s] the intent of the statute without being burdensome." This lack of burdensomeness is a recurring theme in the Secretary's arguments and in the legislative record. In explaining why it chose to utilize a more complex proportional allocation method in cases involving multiple hospice providers, the Secretary argues that:

> The Secretary took a different approach for allocating the number of beneficiaries receiving hospice care between more than one hospice, electing to employ the

> more cumbersome fractional calculation. ... There are two reasons for this different approach. First, instances of hospice beneficiaries moving between hospices are far more rare than instances of hospice beneficiaries receiving care in more than one accounting year. For this reason, the corresponding administrative burden is substantially lower.

To be certain, the Secretary does set forth arguments in support of § 418.309 which do not involve his agency's own administrative burden, but it seems clear, as observed by Judge Frizzell, that easing its own burden was of paramount concern for HHS in promulgating § 418.309. Clearly, this fact lends itself to concerns regarding whether the HHS acted arbitrarily and capriciously in doing so.

Having noted its agreement with the concerns expressed by Judge Frizzell, this court is nevertheless not prepared, at this juncture, to grant the relief sought by either party in this case. In the court's view, plaintiff seeks an extraordinarily broad remedy- the striking down of a long-standing regulation - in an area of the law which is rife with public policy and fiscal concerns which are better addressed, after extensive hearings and inquiry, by the HHS and/or Congress. In researching the issues in this case, this court reviewed a law journal article which provides valuable context for the issues raised in this case and which also gives this court pause as to whether the public policy considerations in this case are sufficiently clear to make federal court intervention advisable at this juncture. See Marc Adler, The Government's Cap on Dying, Why is the Medicare Hospice Benefit Cap Being Exceeded and How Should This Problem Be Addressed?, 4 NAELA J. 201 (2008).

In his article, Mr. Adler notes that, while the Medicare hospice benefit dates back to 1983, it is only in recent years that hospices have begun to exceed the cap:

> Dating back to the inception of the Medicare Hospice Benefit in 1983,

> hospices have historically avoided exceeding the cap amount. This indicates that Medicare reimbursement was largely sufficient to cover the costs of hospice care and helped prevent the risk that hospices would incur a deficit. Recently, however, the cap has become an increasing problem for hospices, although the reasons for this phenomenon have been unclear. According to the National Alliance for Hospice Access ("NAHA"), in 1999 only three states had hospices which exceeded the cap. Conversely, in 2005, the Medicare Payment Advisory Commission ("MedPAC") is reporting that 220 hospices (or about one in every thirteen providers) in at least twenty-five (25) states exceeded the cap by an estimated amount of $166 million -- although NAHA claims that the number is closer to 250 hospices and $200 million.
>
> Industry observers disagree as to whether there is a problem and, if so, what the cause is. Some argue that the escalating frequency with which hospices are exceeding the cap indicates that the cap amount is too low. For instance, the NAHA asserts that the formula to determine the cap amount needs to be modified beyond the usual annual update which is tied to the Consumer Price Index ("CPI"). One reason this update may be inadequate is because healthcare costs rise faster than the CPI. Accordingly, U.S. Senator Pete Domenici (R-NM) has asked the leadership of the Senate Finance Committee to impose a three-year moratorium on cap repayments (spanning 2005-2007) while Congress works on a long-term solution. The difficulty in evaluating the merits of these ideas is that it is unclear why hospices are exceeding the cap. Without understanding why the capitation threshold is being surpassed, it is difficult to determine whether a modified cap amount is an appropriate solution and how -- specifically -- the cap should be modified.

4 NAELA J. at 207-08.

Interestingly, Adler notes that the Medicare cap has proven to be a problem disproportionately in certain states, including Oklahoma and Mississippi, which are largely rural and southern:

> [T]he problem appears to be most prevalent in the Palmetto region of the country which covers many Southern states. In fact, the data indicates that the overpayment amount in the Palmetto region has risen from $5.9 million in the year 2000 up to $94.6 million in 2004! Meanwhile, the rest of the country has few -- if any -- overpayments.
>
> Clearly, there is some facet of the Palmetto region's hospice industry which increases the likelihood of capitation problems. In order to find which states in the

> Palmetto region have the greatest difficulty operating under the cap, one helpful resource is produced by Palmetto GBA, a Medicare Regional Home Health and Hospice intermediary. Palmetto GBA has analyzed the 2005 hospice cap overpayments by state. The table (see "Appendix A") suggests that, in addition to cap problems in rural Western states such as Arizona and New Mexico, the states with the largest cap overpayments are rural states such as Alabama, Mississippi and Oklahoma.

*Id.* at 209. Clearly, Adler's observations are borne out by the federal law suits filed in this context, which are being litigated almost exclusively in the aforementioned states. *See Tri-County Hospice, Inc. v. Leavitt*, 08-cv-273 (ED Okla); *Autumn Bridge LLC v Leavitt*, 08-cv-819 (WD Okla); *American Hospice, Inc. v. Leavitt*, 08-cv-819 (ND Ala); *SE Arkansas Hospice v. Palmetto & CMS*, 08-cv-3287 (ED Ark); *New Frontier Hospice, LLC v. Leavitt*, 08-cv-630 (ND Okla); *Los Angeles Haven Hospice v. Leavitt*, 08-cv-4469 (CD Cal); *Compassionate Care Hospice, LLC v. Leavitt*, 09-cv-28 (WD Okla).

Adler further notes that for-profit hospices exceed the cap at a greater rate than non-for profit hospices, writing that:

> The increased presence of for-profit hospices is significant because their admission patterns (i.e., the type of patients they admit and care for) generally differ from non-profit hospices. Although the Medicare Hospice Benefit was designed to primarily treat patients dying of cancer, studies show that for-profit hospices tend to provide services to a higher proportion of non-cancer patients.

*Id.* at 214. In the court's view, this disparity raises concerns as to whether the profit motive of certain hospices is contributing to the Medicare cap problems. Adler provides his own opinions regarding the causes behind these disparities, and it is not this court's intention to delve into these issues in any depth. It does seem clear to this court, however, that: 1) the HHS's implementation of § 418.309 has proven to be a greater burden to hospices in some areas of the country than in others and has disproportionately affected for-profit hospices; 2) why this

8

disparity exists is unclear; 3) ascertaining the true facts in this regard is best left to the HHS and/or Congress after extensive inquiry and hearings into the matter; 4) the response of Congress and the HHS, if any, will be heavily informed by public policy and fiscal considerations; and 5) this court intends to show Congress and the HHS considerable deference regarding their decisions in this regard.

This court has some sympathy for plaintiff's position in this case, but it is only prepared at this juncture to recommend that HHS and Congress carefully consider what changes, if any, need to be made to the Medicare regulatory framework in order to address the concerns raised in this and similar lawsuits. Even if the court were inclined to take greater immediate steps in this regard, the factual record in this case would likely be too sparse to permit it to do so. As noted previously, plaintiff sought expedited judicial review of the legal issues in this case, but, in doing so, it neglected to establish the kind of factual record which would allow it to receive any tangible recovery in this case. In particular, the plaintiff has failed to establish exactly what monetary damages it suffered as a result of the defendant's implementation of the Medicare hospice cap in this case. A similar scenario appears to have played out in the *Sojourn Care* case. While Judge Frizzell noted his concerns regarding the validity of § 418.309 almost a year ago, he has still not entered a summary judgment order in that case pending clarification of what monetary damages the plaintiff might have suffered.

While this court is thus not prepared to grant the relief sought by plaintiff, it does conclude that plaintiff has raised sufficiently valid concerns that defendant's motion for summary judgment should not be granted. The court concludes that the proper course of action at this juncture is to remand this case to the PRRB so that plaintiff may, if it so chooses, develop a

9

factual record regarding its allegations in this case. Defendant argues that plaintiff lacks the basic standing to prosecute this lawsuit, but it appears likely to this court that plaintiff would be able to establish that at least part of the $1,592,213 amount which it was required to reimburse Medicare is attributable to defendant's enforcement of the Medicare hospice cap. The court agrees with defendant, however, that plaintiff should be required to develop a factual record in this regard prior to proceeding further in this lawsuit.

This court's previously stated reluctance to second-guess policy decisions made by the HHS and/or Congress may well dissuade plaintiff from continuing to litigate this matter. Assuming that plaintiff does decide to proceed further, however, it should first establish before the PRRB that it has suffered monetary damages resulting from defendant's actions in this case. By so doing, the plaintiff will have developed the sort of factual predicate which might entitle it to an actual recovery in the event that such is supported by future events. If it should develop that the HHS fails to even consider the issues raised in this lawsuit or otherwise acts in an arbitrary manner, then this fact might give this court cause to re-examine its decision not to grant plaintiff the relief which it seeks in this case. The court would hope and expect, however, that the existence of pending federal lawsuits, and the concerns raised by federal judges therein, will give HHS and/or Congress cause to re-examine whether the Medicare regulations relating to hospice care may be improved upon. At this juncture, however, the court declines to grant the relief sought by plaintiff, and this matter will be remanded to the PRRB for further proceedings.

In light of the foregoing, it is ordered that plaintiff's motion for summary judgment [20-1] is denied, and defendant's motion for summary judgment [24-1] is denied. This case is remanded to the Provider Reimbursement Review Board for further proceedings consistent with

this court's opinion.

      So ordered, this the 5th day of February, 2009.

                                            /s/ MICHAEL P. MILLS
                                            **CHIEF JUDGE**
                                            **UNITED STATES DISTRICT COURT**
                                            **NORTHERN DISTRICT OF MISSISSIPPI**